# Exhibit A

Exhibit A

# In the Matter Of:

# NIRAV INGREDIENTS, INC. vs WELLS FARGO

3:20-cv-366

# HIMANSHU DOSHI

*March 03, 2021*

ESQUIRE

800.211.DEPO (3376)
*EsquireSolutions.com*

DEPOSITION SOLUTIONS

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 2 of 31

you, it's me.  And my speaker, I've got it turned all the way up, so I'm doing the best I can.  Where did you say you got your degree?

A.  University of Florida, Gainesville.

Q.  Okay.  Got it.  And what year was that?

A.  I passed out in 1978.

Q.  And where did you get your undergrad degree?

A.  That was in India, Indian Institute of Technology Kanpur.

Q.  And what year was that?

A.  I graduated in 1977.

Q.  All right.  And you lived in North Carolina since 1977?

A.  No.  Since 1994.

Q.  Okay.  All right.  And tell me the corporate structure, if you would, for Nirav Ingredients?

A.  It's incorporated in North Carolina.  I am the president.  My son Nirav, my daughter-in-law Shaili, and my wife Priti, they are all working for the company.  The ownership of the company is with my wife, my son, and my daughter-in-law.

Q.  That's who runs the company?

A.  Pardon?

Q.  Are you telling me that's who runs the company or who owns the company?

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 3 of 31

Exhibit A

they did it intentionally or not.  I am not aware of.

Q.  Okay.  And that's fine, you've been doing business with either Wells Fargo it's predecessors for how many years, about 20 years?

A.  About 25 years.

Q.  Or more?  25?

A.  About.

Q.  Okay.  And do you currently use them today?

A.  Yes, sparingly.

Q.  All right.  Do you still have the same account with Wells Fargo today that you had in 2019 when the issues regarding these wire transfers arose?

A.  As far as the company is concerned, yes.

Q.  Okay.  And does the company still use that account?

A.  Very sparingly.

Q.  Well, it does or it doesn't?

A.  Yes, very sparingly.

Q.  Okay.  And has Nirav opened any other accounts at any other institutions since the issue regarding these wires arose?

A.  Yes.

Q.  Okay.  And where did it open those accounts?

A.  PNC Bank.

Q.  PNC?

A.  Yes.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 4 of 31
Exhibit A

using the PNC account for wire transfers, some of them have, some of them have not; is that correct?

A. Correct.

Q. Okay. Those that continue to use the Wells Fargo or transfer the Wells Fargo account, have you reached back out to them to tell them, hey, use the PNC account?

A. I believe so, but that matter is being handled by my son Nirav, but I believe they have been reminded.

Q. Okay. And when did you open the PNC account and start instructing customers to use that account?

A. I don't remember the exact timeframe, but it's early part of 2020.

Q. Okay. It was after the wire issues that we are here about today?

A. Correct.

Q. All right. And have Nirav Ingredients had any problems with either wires or any other problems with the Wells Fargo account since the wires we are talking about or the issues we are talking about today?

A. Can you repeat the question please?

Q. Yes. I'm excluding the wire transfer issues that we're going to talk about that are the subject of the lawsuit. Have you had any other issues or problems

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 5 of 31
Exhibit A

with the Wells Fargo account that you have for Nirav Ingredients?

A.   Not that I recollect.

Q.   Okay.  Thanks.  Since May of 2019 when these wires took place, has Nirav Ingredients changed any of its procedures other than having clients or asking some clients to start using the PNC account for wire transfers?

A.   What kind of procedures are you referring to?

Q.   Thank you for asking that, and that goes for all day. If you don't understand a question, let me know and I will rephrase it.

Has Nirav Ingredients changed any of its banking procedures or procedures for sending or receiving wires other than what you already testified to?

MR. McTIER:  Objection, compound.  You can answer.

MR. HAYSLIP:  I'm glad to break it up. Just trying to speed it along.

Q.   Has Nirav Ingredients changed any of its procedures for receiving wire transfers since the May of 2019?

A.   Yes.  We have implemented, as I said, to our customers to giving them new instructions for wire transfer to the new PNC bank account.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:20-cv-00366-FDW   Document 27-1   Filed 04/14/21   Page 6 of 31
Exhibit A

Q.   Okay.  And did you do that by calling the customers or sending them an e-mail?

A.   No, we have sent them letters under the stamp of the corporation.

Q.   I'm sorry, you say you sent them letters and what else?

A.   With the stamp of the corporation.

Q.   Okay.  And did you send an individualized letter or a form letter?

A.   Pardon?

Q.   Did you send an individualized letter to each client or did you send them a form letter and they all got the same letter?

A.   No, it was individualized letter to each customer.

Q.   Okay.  And approximately how many did you send?

A.   Must be 20 or 30.

Q.   You say 20 or 30?

A.   Uh-huh.

Q.   Okay.  And did you send one to Ash Ingredients?

A.   Yes.

Q.   Okay.  And has Ash Ingredients continued to pay, make payments to Nirav through its Wells Fargo account?

A.   No.

Q.   Okay.  Does it now use the PNC account?

A.   Yes.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 7 of 31

Exhibit A

MR. HAYSLIP: Okay. Corey or Ty, if one of you would check into those and get us copies. I don't think we've got those letters, but we can get them later.

Q. I think in your complaint you talk about that you all have had sales of over $79 million conducted through that Wells Fargo account. Does that sound about right over the years?

A. Yeah, it sounds right.

Q. Okay. And other than the issue that we are here about today, has there ever been any problem with the Wells Fargo account?

A. Well, I have to go back in memory lane, but I don't recollect right away.

Q. Okay. All right. None stand out to you today from memory?

A. Pardon?

Q. No problems stand out to you today that you can recall?

A. No, I don't recall right away.

Q. All right. And I think in your complaint you talk about that there's been $69 million in purchases over the years by Nirav Ingredients using its Wells Fargo account. Does that sound about correct?

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 8 of 31
Exhibit A

A.   It sounds correct.

Q.   Okay.  And utilizing that $69 million on top of the $79 million that we talked about already, you've got about $148 million in transactions; does that sound about right?

A.   That's correct.

Q.   So about $148 million in transactions over a 25-year period; does that sound about right?

A.   That's just the figure of our sales and purchases. There could be other transactions which we make payments for expenses.

Q.   Okay.

A.   So that could be separate.

Q.   All right.  Well, utilizing just even just that number, the 148 million, is it fair to say that you can't recall any problems or issues with the Wells Fargo account other than the problems that we are here about today?

A.   Correct.

Q.   All right.  And your Nirav Ingredients' relationship with Ash, is that just a vendor agreement or is there any other type of agreement with them or arrangement, business relationship?

A.   No, just customer and supplier relationship.

Q.   Okay.  They are the customer and Nirav Ingredients is

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 9 of 31
Exhibit A

Q.    Okay.  And how long has that entity been in existence, approximately?

A.    Approximately ten years, I would say, give or take a few.

Q.    Okay.  And has it always had an account at Wells Fargo?

A.    Correct, until we opened the account in PNC last year.

Q.    Okay.  And has it ever had any problems or issue with its Wells Fargo account?

A.    Not that I recollect.

Q.    Okay.  With respect, and I'm just going to talk about Ash Ingredients right now, when they place an order, do they do it online or via mail or pick up the phone, how does that work?

A.    They send us a formal order by e-mail.

Q.    Okay.  And do you talk with them ever on the phone?

A.    Yeah, quite often.

Q.    Quite often?

A.    Uh-huh.

Q.    I'm sorry, and that's another one, you have to say yes or no for the court reporter.

A.    Yes.

Q.    And I may be guilty of the same thing because she can't take down a nod or uh-huh.  So thanks for the

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 10 of 31
Exhibit A

it's incumbent upon Wells Fargo to credit our account.

Q. Okay. And has -- have you turned any of the invoices that remain unpaid over to any collection agency?

A. No.

Q. All right. Do you show them as over 120 days past due on the books of Nirav Ingredients?

A. Pardon?

Q. Do you show them as past due invoices on the books and accounts of Nirav Ingredients?

A. Correct.

Q. All right. And other than this lawsuit, has Nirav Ingredients done anything whatsoever to try to collect on those invoices?

A. Yes. We have followed up regularly with Wells Fargo to credit our account --

Q. All right.

A. -- in this amount.

Q. Okay. I said other than this lawsuit, has Nirav Ingredients done anything to attempt to collect on those invoices that remain outstanding from Ash Ingredients?

A. Yes. Again, we have followed up with Wells Fargo to credit our account with the amount. We have complained to CFPB consumer forum.

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 11 of 31

**Exhibit A**

Q. And, Mr. Doshi, I might not be very clear. I understand you've contacted, you've got this lawsuit against Wells Fargo and you contacted them early on. My question is, other than this lawsuit, after this lawsuit was filed, pick a date, have you done anything to attempt to collect the balance of those outstanding invoices from Ash Ingredients?

A. No.

Q. Okay. And I'm going to ask you a hypothetical now. If you don't collect anything from Wells Fargo in this lawsuit, is there a plan on how to collect those invoices from Ash Ingredients?

MR. PARTON: Objection. Speculation.

Q. Go ahead.

A. It's a hypothetical situation.

Q. Pardon?

A. It is a hypothetical situation.

Q. I agree with you. So, and that's my question is, what do you plan to do or how do you plan to collect those invoices if you don't collect them from Wells Fargo?

A. We will address the issue when the time comes.

Q. Okay. Well, you're not saying you could collect it from Wells Fargo and from Ash Ingredients, are you?

A. No. We are not saying that we will collect from both

ESQUIRE
DEPOSITION SOLUTIONS

**Exhibit A**

ends.

Q. Well, that's my point. You can't collect it twice, right?

A. Correct.

MR. PARTON: Objection.

Q. Have you sent any past due notices or requests for payment on those outstanding invoices to Ash Ingredients, the invoices we are talking about?

A. No.

Q. Okay. So other than the -- since the date of the wire we are talking about, May of 2019, has Nirav Ingredients done anything whatsoever to try to collect those funds from Ash Ingredients?

A. I think this is a repetition. I have said earlier that we have followed up with them for other invoices but not these invoices, because they have said they already remitted the amount and we need to collect it from Wells Fargo.

Q. Okay. Let me ask you this, you agree with me that it looks like somebody hacked into either Nirav Ingredients or Ash Ingredients' e-mails?

A. Correct.

Q. Have you or Ash figured out whose system was hacked?

A. It seems our system was hacked. I'm not sure if Ash Ingredients' system was also hacked.

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 13 of 31
**Exhibit A**

don't know about you, you can put it in layman's terms, how it was discovered that the Nirav Ingredients' e-mail system had been hacked?

A. Well, I think Ash Ingredients sent us a copy of the e-mail they had received giving the new account number information, and that's where it was noticed that the e-mail addressed an extra V.

Q. Correct.

A. It was not the correct address.

Q. Yeah.

A. So that's when --

Q. Yeah. And I think, I think I have seen that e-mail, we will get to it in a minute. But was your son able to determine how Mr. -- or call it the hacker, was able to access Nirav Ingredients' system to know who, for example, to send an e-mail to, Ash or anybody else?

A. No. I think you've got to ask him that question.

Q. Okay. Do you understand? Has he told you?

A. Well, it's complicated according to me, so I said you handle this situation.

Q. No. And I mean I will ask him, but I'm asking you, basically what you understand.

A. I just understand that our e-mail was hacked, and then this whole episode has taken place.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 14 of 31
Exhibit A

screen, Mr. Doshi.  And it says that:  Upon information and belief Wells Fargo failed to verify the hacker's identity before allowing hacker to open the account.  Do you see that sentence?

A.   Yes.

Q.   Are you aware of a shred of evidence to support that statement?

A.   I'm not sure.

Q.   Okay.  You're not sure if you have any knowledge, is that what you are saying?

A.   Correct.

Q.   All right.  Let me ask you this, the statement says that Wells Fargo failed to verify the hacker's identify before opening the account.  As you sit here today, can you give me any evidence that Mr. Doshi is aware of that would support that statement?

A.   I am not aware of.

Q.   Okay.  And are you aware of anybody on this entire Earth that has any evidence to support that statement as you sit here right now?

          MR. PARTON:  Objection.  Speculation.

A.   There could be.  I cannot say either ways.  It's quite possible.

Q.   I understand.  My question is, are you aware of anybody on this entire Earth that has any evidence to

ESQUIRE
DEPOSITION SOLUTIONS

Case 3:20-cv-00366-FDW   Document 27-1   Filed 04/14/21   Page 15 of 31

**Exhibit A**

support that statement?

A.   I'm personally not aware of it.

Q.   Pardon?

A.   Personally, I am not aware of it.

Q.   So right now you're not aware of anybody?

A.   Yes.

Q.   That's correct?

A.   Correct.

Q.   All right.  And you looked at the documents that Wells Fargo produced in this litigation, and based on those documents, in fact, would you agree with me that Wells Fargo did verify the identity of the person opening the account, correct?

          MR. PARTON:  Objection.  Speculation.

A.   I am not in a position to make a judgment on that.

Q.   Pardon?

A.   I cannot pass a judgment on that, whether proper procedures were followed or not.

Q.   Okay.  You testified earlier that it looked like, to you, that a driver's license had been shown with respect to the person opening the account, correct?

          MR. PARTON:  Objection.

A.   It just mentions a driver's license number.  I don't know whether it's, whether it belongs to or not.  So I cannot comment.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:20-cv-00366-FDW     Document 27-1     Filed 04/14/21     Page 16 of 31
Exhibit A

correct.

Q.   Okay.  Got it.  And it says it's from Nirav Doshi, and that's not actually from him, correct, that e-mail?

A.   Right.  It's gone from the other account, which the hacker created.

Q.   Okay.  We will call him hacker for purposes of this, and that's the e-mail which caused all the problems we are here about today, right?

A.   Right.

Q.   And when was the first time, and I'm going to scroll up in a minute, it may be this next e-mail, when was the first time you learned about this hacker e-mail?

A.   I believe after June 3rd or so when Nirav started following up for payment again.  And then the e-mail was sent from -- by Legna to Nirav that it was sent to this new account.  It's somewhere --

Q.   Okay.

A.   -- in June.

Q.   And it says FYI and --

A.   Yeah.

Q.   -- that's the e-mail on June the 3rd?

A.   Correct.

Q.   And it says -- and this is this is addressed to your son, correct?

A.    Correct.

Q.    Or you see this e-mail right here?

A.    Correct.

Q.    Is that you or your son?

A.    Again, my son.

Q.    Okay.  And it says, you can see where they put new account, closed quote, it was sent from the suspicious e-mail?

A.    Right.

Q.    I am assuming that there had been a discussion with Ash before this e-mail was sent to your son, is that correct, based on your understanding?

A.    I believe so.  He had a discussion with Legna and probably their discussion they found that she, what e-mail she was sending he was not receiving, so he asked her to send to this, to his other e-mail account.

Q.    Got it.  And so is this what set off the investigation to find out what happened to the payment?

A.    Correct.

Q.    All right.  And how did you learn about the missent wire?

A.    Nirav called me that we have a problem saying as soon as he learned this.

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 18 of 31
Exhibit A

Q. Okay. And what did you do?

A. I mean, I said, well, let's start following up now. Let's get in touch with Wells Fargo immediately and inform them and ask them to credit the account amount to our account rather than some other account, and that's when we all started corresponding with Wells Fargo.

Q. And do you remember what date Wells Fargo was contacted?

A. I believe it was the same, it must be the same day, June 3rd or at the most June 4th. I'm not sure. It's in the correspondence.

Q. Yes. And you have seen the documents now, based on that June 3rd date you're aware that the money had already been, that had been mis-wired by Ash was already gone out of the account, aren't you?

A. No. That we came to know later on when we started following up with Wells Fargo.

Q. Pardon?

A. Well, once we started following up with Wells Fargo, that is when we learned that the money had gone to a different account, and from there it had been cleared out.

Q. Yeah. It had already disappeared by the time that you learned about it, Ash Ingredients -- excuse me.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 19 of 31
Exhibit A

By the time Nirav Ingredients learned about it and contacted Wells Fargo, the money had already gone, correct?

A. Correct.

Q. All right. And --

A. That's based on the information, again, that has been furnished to us by Wells Fargo.

Q. I'm sorry. Based on the information produced by Wells Fargo?

A. Yes.

Q. Okay. Well, I assume that when you -- do you remember who the primary point person was talking with Wells Fargo on behalf of Nirav Ingredients?

A. Nirav, my son.

Q. Okay. And do you know -- I am assuming he was telling you what was going on in connection with the investigation?

A. Correct.

Q. And did he tell you that Wells Fargo told him he couldn't disclose information about an account to which Nirav Ingredients wasn't a party or on the account documents?

A. Yeah. He kept me informed of what response he was getting from Wells Fargo.

Q. Okay. And when was the first time you learned the

identity of who, and it might have been after this litigation was started and the documents were produced, when was the first time you learned who the account holder was for the account where the wires were transferred into from Ash?

A.  The name of the account number, of the account holder?  Are you --

Q.  Yes.

A.  Can you repeat the question?

Q.  When did you learn who the account holder was where the money actually was wired into?

A.  That's when Wells Fargo responded to the queries that were raised in the complaint.

Q.  Okay.  It was after the lawsuit?

A.  Correct.

Q.  Okay.  Got it.  Did -- before the wire that Ash sent to the account of Mrs. Paige, Ms. Karen Paige, did Nirav Ingredients have any written wire procedures to try to avoid what happened?

A.  We came to know for the first time that this thing has happened.

Q.  This was the first time it ever happened?

A.  Correct.

Q.  Yeah.  And my question was --

A.  So --

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 21 of 31
Exhibit A

Q.   My question --

A.   -- we created the new procedure.

Q.   Okay.  At that time you didn't have any procedures in place to try to avoid this issue at Nirav?

A.   We were not aware of such wire frauds taking place, and that's one of our contentions, that Wells Fargo should have educated its clients that these things are prevailing.

Q.   These things are what?

A.   These things are happening these days.

Q.   Okay.  And what has Nirav done to try to avoid a duplication of what occurred?

                MR. PARTON:  Objection.  Asked and
                    answered.

A.   I already informed you earlier, we have sent detailed letters to our clients, customers, and informed them that they should not entertain any information about change of account or wire transfer instructions by e-mail.  It will always come by way of a letter from the company, under the stamp of the company.

Q.   Okay.

A.   That is what we have conveyed to the customers, they should not entertain any e-mail changes or other changes to wire transfer instructions if they receive by e-mail.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 22 of 31
Exhibit A

Q.   Okay.  And, Mr. Doshi, I'm trying to ask you as straightforward as I can.  Based on the information you have today, and you can only answer based on your knowledge today, do you have a shred of evidence that Wells Fargo had anything to do with this e-mail?

        MR. PARTON:  Objection.

A.   It's the same question.  But, well no, we -- I cannot say that because I don't know who the hacker was.

Q.   I understand you don't know who the hacker was.  But if you've got any evidence whatsoever, a shred of evidence that it was from Wells Fargo, I want you to tell me.  And if you don't have any evidence, that's fine.

A.   No, I don't have evidence.

        MR. PARTON:  Objection.  Asked and
           answered.  I mean, he said he doesn't
           know.  The evidence might show that,
           it might not.

        MR. HAYSLIP:  Well, no, that's two
           different questions.

Q.   So the answer is, at least right now, as you're giving your deposition today, on March the 3rd, 2021, you don't have any evidence whatsoever that Wells Fargo had anything to do with that e-mail being sent; is that correct?

Case 3:20-cv-00366-FDW   Document 27-1   Filed 04/14/21   Page 23 of 31
Exhibit A

MR. McTIER:  Objection.

A.  That's what I am saying.  If they would have called us at that time and we would have known this e-mail exists with them, then it would have been immediately clear that it's a fake e-mail.

Q.  Yeah.  And that's what I am saying is, if Ash had simply picked up the phone and called, you could have clarified that, do not wire the money to that account, correct?

A.  Correct.

Q.  All right.  Nobody at Ash ever did call before wiring the funds to verify the accuracy of these wiring instructions to Nirav Ingredients, did it?

A.  Correct.

Q.  All right.  Have you ever had any discussion with anybody at Ash Ingredients about whether or not their system was also hacked?

A.  No.  We just informed them that they should check whether their system was hacked or not.

Q.  Okay.  And did they ever get back to you on that?

A.  No, they said they have a separate system, security system, so they would check and they have not --

Q.  I'm sorry, they?

A.  We have not heard anything.

Q.  I'm trying to listen.  They said what?

Case 3:20-cv-00366-FDW   Document 27-1   Filed 04/14/21   Page 24 of 31
Exhibit A

that e-mail to be true, is it Nirav's fault, Ingredients?

MR. McTIER:  Objection.

A.   No.

Q.   Is it Wells Fargo's fault?

MR. PARTON:  Objection.

A.   Doesn't look like.

Q.   Pardon?

A.   No.

Q.   Are you aware of anything that prevented Ash from picking up the phone to call Nirav to verify the accuracy of the information that was in the e-mail that it believed to be true?

A.   Can you repeat the question please?

Q.   Yes, sir, I can, Mr. Doshi.  Are you aware of anything that prevented Ash from picking up the phone and calling Nirav Ingredients to verify the accuracy of that e-mail?

A.   No.

Q.   Okay.  Will you agree with me that if Ash had bothered to pick up the phone and simply called Nirav Ingredients, this whole situation could have been avoided?

MR. McTIER:  Objection.

A.   Yes.

Case 3:20-cv-00366-FDW   Document 27-1   Filed 04/14/21   Page 25 of 31
Exhibit A

doesn't apply to this particular instance.

Q. Okay. So you looked into whether or not it was covered by insurance and it wasn't?

A. We looked into the policies that we have, different insurance policies, and came to the conclusion that there is no way of claiming under those policies.

Q. Okay. Has Nirav Ingredients done anything else to mitigate its damages?

A. We don't know what else we can do.

Q. Pardon?

A. We, one thing we did is we requested Ash Ingredients to file an FBI report, file a complaint with FBI. So that probably we thought FBI will be able to catch the culprit and get us the money, but nothing has happened there.

Q. Okay. And based upon what your knowledge is at Nirav Ingredients, the problem or the damages that Nirav sustained was because of the wire that was missent by Ash Ingredients; is that correct?

MR. McTIER: Objection.

A. The wire was not missent. The wire had misinformation, you can say, because of the hacker's e-mail.

Q. Okay. And that misinformation, as you characterize it, was the result of Ash Ingredients putting the

800.211.DEPO (3376)
EsquireSolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 26 of 31
Exhibit A

was done, opened, you can see September 30, 2014, correct?

A.   Correct.

Q.   So this account has been in existence almost five years when the wire was missent by Ash Ingredients, correct?

A.   Correct.

Q.   And I'm asking your best knowledge, and you can tell me you don't have any knowledge, you can tell me any details you want.  You're not aware of anything improper about this account application, anything being improper that would -- names that should not have been an opened account, are you?

A.   I cannot comment on that because whether everything has been checked properly or not.

Q.   Okay.

A.   I cannot comment on that.

Q.   And that's my question right now is, you are not aware of anything as we sit here today that was improper about the opening of the account, are you?

            MR. PARTON:  Objection.

A.   Not that I know of.

Q.   Okay.  And sitting here today, you don't know if Mrs. Paige, whose signature is on this account application, is just an ordinary, everyday citizen

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 27 of 31
Exhibit A

Q.   who her account got hacked or not, do you?

A.   I don't know.

Q.   Okay.  And you will agree with me that at least the opening of the account itself in 2014 isn't what caused the damage to Nirav Ingredients, correct?

MR. PARTON:  Objection.

A.   Not necessarily.

Q.   Okay.  It's the money being sent into the account and then taken out is what your concern is, correct?

A.   Not necessarily.

Q.   Okay.  I think that, yep, that's the last page of Exhibit 3.  And you have seen this that document as it's been produced in this litigation on behalf of Wells Fargo, correct?

A.   Correct.

Q.   Exhibit 3.  All right.

You will agree with me that if that account was opened as it says on September 30, 2014, it existed a long time without any issue ever arising or any problems or any damage to Nirav Ingredients, correct?

A.   Prior to this particular wire transfer, yes.

Q.   Okay.  And I'm looking -- close this.  I want to ask you, this is going back to your complaint and I'm going to ask you a question right now with respect to

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 28 of 31
Exhibit A

Do you know when Nirav Ingredients opened its account 20-some-odd years ago, which is the account where it is at Wells Fargo today, what kind of identification was used to open the account?

A.    I don't remember.  It was 25 years back, but First Union, at that time it was First Union.

Q.    Right, predecessor to Wells Fargo.  My question is, do you know what information was used to open the account?

A.    I don't remember.

Q.    Okay.  Do you know if the methods and the procedures to open that Nirav Ingredients account is any different than the information used to open the account that I showed you on Exhibit 3?

A.    I don't remember what was asked from us at that point of time.

Q.    Pardon?

A.    I don't remember what information was asked from us when we opened the account in 1995.

Q.    Okay.  So your answer would be you don't know if there was any different standard or not; is that correct?

A.    Correct.

Q.    Because you don't remember?

A.    Correct.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 29 of 31
Exhibit A

Q. Oh, okay. I got you. So some of those payments --

A. That PNC account might be opened in 2019, and some of those later payments could be PNC account. So we need to check the record.

Q. Okay. I got you. No problem. Thank you for making that clarification.

Has Nirav sustained any damages or claimed any damages other than the total amount of the two wires?

A. Yes. Damages have been claimed in the complaint.

Q. I'm sorry?

A. Damages have been claimed in our suit.

Q. I apologize, Mr. Doshi, I can't understand you. You said damages are what?

A. Damages have been claimed in the suit that we have filed.

Q. Yes. And what are you saying the damages are in addition to the total amount of the two wires?

A. The expenses that we have incurred for our lawyers.

Q. Okay. All right. Attorneys' fees, anything else?

A. And the physical damage that took place on me personally.

Q. Okay. On you personally, health issues?

A. Health issues.

Q. Okay. Well, you're not -- you agree with me you are

Q.    not a plaintiff in this case, are you?

A.    No, the company is.

Q.    Pardon?

A.    The corporation is a plaintiff.

Q.    Right.  You're not an individual plaintiff, correct?

A.    I am not named as a plaintiff in the suit that has been filed.

Q.    Okay.  And the health issues, are you talking about the heart issues?

A.    Yes.

Q.    And you started those health issues in 2017, right?

A.    No.

Q.    Didn't you go to the ER to see a doctor back then on the same issues?

A.    In 2017?

Q.    Or '18, '17 or '18.

A.    No, not that I recollect.

Q.    Okay.  I'm just looking at the medical documents which have been provided.

A.    There was 2019.

Q.    All right.  Do you know why you produced any medical records from 2017 and '18?

A.    We -- there were no instances.

Q.    Okay.  I mean, I'm saying, do you know why medical records would have been produced from that period?



Case 3:20-cv-00366-FDW    Document 27-1    Filed 04/14/21    Page 31 of 31
Exhibit A